UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

Somera Road – 1100 Main Street, LLC, a Delaware
limited liability company,

No. _____

Plaintiff,

**COMPLAINT**

- against-

**JURY TRIAL DEMANDED**

TPG RE Finance 1, Ltd., an exempted company
incorporated with limited liability under the laws of the
Cayman Islands; TRTX 2019-FL3 Issuer, Ltd., an
exempted company incorporated with limited liability
under the laws of the Cayman Islands; TPG RE Finance
Trust, Inc., a Maryland corporation, and DOES 1 through
10,

Defendants.
-------------------------------------------------------------------X

Plaintiff Somera Road – 1100 Main Street, LLC ("Borrower"), by and through its

undersigned attorneys, hereby files this Complaint against Defendants TPG RE Finance 1, Ltd.,

TRTX 2019-FL3 Issuer, Ltd., and TPG RE Finance Trust, Inc. (together, "Lender") hereby alleges

the following:

## I.     Nature of This Action

1.     This action is for Breach of Contract, Declaratory Relief, and Equitable Relief. TPG

RE Finance 1, Ltd., TRTX 2019-FL3 Issuer, Ltd., and TPG RE Finance Trust, Inc., and their

agents, successors, and assigns (together, "Lender"), acted in bad faith to deny Borrower the fruits

of the parties' agreement related to a $60,200,000 first mortgage loan. Borrower owns an office

building in Kansas City, Missouri (the "Property") and entered into an agreement with Lender for

a $60,200,000 loan with the specific purpose to reposition and lease the Property (the "Loan"). In

issuing the Loan, Lender agreed to make regular advances to Borrower to enable Borrower to

achieve its business plan. Lender is in the middle of its own, very public, liquidity crisis and as a result Lender has acted in bad faith by refusing to fund advances to Borrower under the Loan. Instead, Lender arbitrarily continues to claim that Borrower must fund an irrational shortfall, that includes amounts that are not related to any work requested and approved under the Loan, or that Lender has otherwise approved.

2.     Lender has breached its obligations under the Loan. Lender is avoiding funding its share of expenses through advances under the Loan, as agreed, by grossly exaggerating a "shortfall" with the intent to use Borrower's funds to cover Lender's Share of the Loan. Thus, Lender deprives Borrower of the benefits of the Loan in bad faith in breach of the parties' agreement. Lender has acted outside of the Loan Agreement and without justification for its own personal gain or preservation. As specifically alleged herein, Borrower respectfully requests that the Court direct Lender to fund the advances detailed herein, enjoin Lender from taking any adverse action against Borrower's Property (or interest therein) as a result of Lender's bad faith, and award Borrower damages for Lender's breach.

## II.     Jurisdiction

3.     The Court has subject matter jurisdiction over this action based on complete diversity of the parties and the amount in controversy, which is in excess of the statutory threshold, pursuant to 28 U.S.C. § 1332. To date, Lender has deprived Borrower of no less than $3,957,619.47 in advances under the Loan, damaged Borrower's reputation in the Kansas City, Missouri community, and caused Borrower to suffer other damages, including attorneys' fees, in an amount to be proved at trial.

4.     The Court has personal jurisdiction over Defendants because Defendants regularly and systematically conduct business in New York, because Defendants' performance under the

Loan has been in New York, because Defendants conducted business with Borrower in New York, and because the parties agreed in the documents governing the Loan that any dispute may be brought in New York.

### III.   Venue

5.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c). A substantial part of the events and transactions occurred in this district and Borrower resides in the district. In addition, the parties agreed that any lawsuits regarding a dispute under the Loan would be enforced under New York law, and may be brought in the New York courts.

### IV.   Parties

6.      Plaintiff Somera Road – 1100 Main Street, LLC ("Borrower") is a Delaware limited liability company with its office located at 130 West 42nd Street, 22nd Floor, New York, New York 10036.

7.      Defendant TPG RE Finance 1, Ltd. ("TPG") is an exempted company incorporated with limited liability under the laws of the Cayman Islands. For all times relevant herein, TPG has maintained its principal place of business located at 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102. TPG is qualified to do business in the State of New York.

8.      Defendant TRTX 2019-FL3 Issuer, Ltd., ("Issuer") is an exempted company incorporated with limited liability under the laws of the Cayman Islands. For all times relevant herein, Issuer has maintained its principal place of business located at 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102. Issuer is qualified to do business in the State of New York.

9.      Defendant TPG RE Finance Trust, Inc. ("Sponsor") is a corporation organized under the laws of the State of Maryland, a mortgage real estate investment trust. For all times relevant herein, Sponsor has maintained its principal place of business located at 7 St. Paul Street,

Suite 820, Baltimore, Maryland 21202. Sponsor is qualified to do business in the State of New York. Sponsor created, organized, controls and manages TPG and Issuer, and Sponsor has accepted all obligations and benefits that relate to TPG, Issuer, and the Loan. TPG and Issuer are not adequately capitalized or insured; nor has Sponsor respected the corporate formalities for these entities, Sponsor, TPG and Issuer share the same employees, offices, legal and accounting functions, and otherwise fail to respect the separateness of the entities. At all times herein Sponsor has used TPG and Issuer as mere instrumentalities for the benefit of Sponsor and its shareholders. At all times, Borrower has only corresponded with Sponsor regarding the Loan. Sponsor has held itself out as TPG and Issuer to the public, and to Borrower regarding the Loan. Therefore, ultimately, Sponsor is liable for the decisions and actions of TPG and Issuer under the Loan.

10.     Borrower does not presently know the names or identities of Defendants DOES 1 through 10 which are in control of Lender, responsible for the obligations to Borrower under the Loan, or otherwise responsible under law or equity for the actions of Lender under the Loan. Borrower will amend the claims to include the specific factual allegations against DOES 1 through 10 as Borrower discovers those through this action.

11.     For all times referenced herein, Sponsor has acted by and through TPG and TRTX, and therefore, Sponsor, TPG and TRTX are referred herein together as "Lender".

### V.     Facts

#### Borrower's Business Plan

12.     Borrower acquired the Property, a distressed office building located in downtown Kansas City, Missouri with forty-nine percent (49%) occupancy, with the express plan to completely reposition the Property as the premier downtown office building in downtown Kansas City. To do this, Borrower solicited bids, negotiated contracts, and engaged vendors with Lender's

knowledge and approval, to make expenditures that achieve a best-in-class package to retain and attract tenants to achieve stabilized occupancy, with amenities and quality improvements, including co-working space, upgraded fitness center, modernized lobby, exterior terraces, and other architectural improvements to modernize the Property.

13.    Critical to achieving its goals for the Property, Borrower had to establish and maintain relationships in the Kansas City market with local businesses, current tenants, prospective tenants, brokers, vendors, contractors, and other community leaders. These relationships are based on trust, and confidence in Borrower as a well capitalized counter party to do the things that Borrower says it will do in a timely manner. This includes making timely payments and following through with Borrower's business plan for the Property.

14.    In order to execute Borrower's business plan, Borrower intended to invest some of its own money and to obtain a loan. Borrower approached Lender in order to obtain a loan to enable Borrower to successfully execute its business plan.

**Lender Approved Borrower's Cap-Ex Budget**

15.    On January 8, 2019 (the "Closing Date"), Borrower entered into an agreement with Lender whereby Lender agreed to lend Borrower $60,200,000 (the "Loan") to allow Borrower to execute its business plan to improve, lease, and operate the Property (the "Loan Agreement"). Attached hereto as **Exhibit A** is a true and correct copy of the Loan Agreement. The Loan included $28.25 million to acquire the Property and Lender's continuing obligation to fund $31.95 million to Borrower to execute Borrower's business plan.

16.     On or around the Closing Date, the Lender approved Borrower's initial Cap-Ex Budget[1] with the understanding that Borrower based the initial Cap-Ex Budget on Borrower's preliminary schematic design as of the Closing Date. The parties attached the initial Cap-Ex Budget to the Loan Agreement as Schedule II.

17.     Lender understood that the purpose of the Loan was to allow Borrower to renovate and lease the Property and that Borrower would be making regular requests for advances under the Loan to pay for capital expenditures, tenant improvements and leasing commissions, and other costs according to Borrower's business plan. These expenses were reflected in the Cap-Ex Budget, or the Property's leases, or otherwise approved by Lender.

18.     On the Closing Date, the Borrower funded $6,000,000 of equity to be used for future Cap-Ex Work, and obligated itself to pay twenty-five percent (25%) of future Cap-Ex Work costs and fourteen and three tenths percent (14.3%) of future tenant improvements and leasing commissions costs ("Borrower's Share"). Lender is obligated to pay seventy-five percent (75%) of Cap-Ex Work costs and eighty-five and seven tenths percent (85.7%) of tenant improvements and leasing commissions costs ("Lender's Share") through Advances[2] under the Loan.

19.     The parties contemplated that Borrower would modify the initial Cap-Ex Budget with the Lender's prior written consent after the Closing Date. Borrower could make no changes without Lender's approval. It is standard practice in the commercial real estate industry to begin with a preliminary schematic design, progress through design development and finalize

---

[1] "Cap-Ex Budget" is defined as "a budget with reasonably sufficient detail on a line item basis, which details all Approved Cap-Ex Expenses, in Borrower's best estimate, to be incurred by Borrower through and including the achievement of completion of the Cap-Ex Work, certified by Borrower to Lender and approved by Lender."
[2] "Advances" is defined in Section 2.1.2 to include Cap-Ex Advance, TI/LC Advance, and Interest Advance.

construction documents before commencing construction. Since the Cap-Ex Budget was based solely on a schematic design, Lender and Borrower expected that the Cap-Ex Budget would change as design plans were developed and documented.

20.     In May 2019, Borrower and Lender anticipated modifications to the Cap-Ex Budget, but Borrower was working on refining final design and expenses; Lender acknowledged this and consented to receiving modifications later in time.

21.     On September 4, 2019, Borrower submitted a revised Cap-Ex Budget to Lender (the "Effective Budget"). Attached hereto as **Exhibit B** is a true and correct copy of the Effective Budget. The Effective Budget presented specific line item changes to proposed expenses that were in the initial Cap-Ex Budget; for example, as described below, Borrower reduced the expense related to "Clean Tower," from $837,000 to $0.

22.     On December 4, 2019, Lender approved the Effective Budget; however, Lender made approval of the Effective Budget conditional on Borrower's funding $463,987 into a Lender-controlled reserve account related to work detailed in the Effective Budget.

23.     On December 6, 2019, Borrower promptly satisfied Lender's condition for approval of the Effective Budget by funding a Lender-controlled account with $463,987. To date, the parties have not amended or modified the Effective Budget and it remains in full force and effect under the Loan Agreement.

### Lender's Denial of Borrower's Proposal for a New Loan

24.     On January 15, 2020, Borrower initiated discussions with Lender regarding a possible expanded scope of work related to a larger loan for the Property to replace the Loan (the "Proposed New Loan"). Included in the Proposed New Loan was a proposed expanded scope of work related to the Property outside of the Effective Budget. The expanded scope of work was not

necessary under the business plan agreed upon between Borrower and Lender at the Closing Date, but it was an attempt to achieve higher rental rates and potentially higher value for the Property.

25.     On or about February 13, 2020, Lender rejected the Proposed New Loan and expanded scope of work and discussions between Borrower and Lender regarding a replacement loan stopped. Thus, the Effective Budget pursuant to the Loan remained in full force and effect.

### Lender Has Financial Difficulties and Lacks Liquidity

26.     Sponsor is in the business of providing commercial real estate loans to owners while using as little of Sponsor's money as possible through the use of short-term repurchase agreements provided by "warehouse banks" for the sole purpose of enhancing yield. Extending beyond its original scope of providing loans, Sponsor, TPG, and Issuer have amassed a large portfolio of securities purchased through even more lending facilities. As a result, Lender is feeling pressure from two directions: (1) its own lenders whom it borrowed from on margin with short-dated callable loans, and (2) Borrower to whom Lender is obligated to provide Advances under the Loan Agreement. Lender is experiencing a cash squeeze as its own margin lenders are demanding Lender post additional cash collateral as security given the decline in value of the market. Lender lacks equity to fund its obligations to its warehouse banks; Lender lacks equity on its balance sheet, Lender cannot raise equity in the collapsing capital markets, and Lender cannot generate equity by selling any existing assets at this time.

27.     Sponsor created a financial house of cards through various financial leverage structures and a maze of off shore entities and special purposes vehicles designed solely to increase yield and in actuality have placed Lender in a completely foreseeable position of much more unnecessary risk. Here, Sponsor securitized the funded $28.34 million of the loan in a Collateral Loan Obligation ("CLO"), effectively leveraging their asset at 85%. Sponsor retained the

remaining $31.81 million unfunded portion of the loan on balance sheet, depending entirely on warehouse banks to fund the majority of this, as evidenced by the financial information disclosed in a March 18, 2020 company release mentioned below.

28.     Lender admitted publicly that it is having liquidity issues. There is a public perception that Lender is insolvent in considering that Lender has hired restructuring advisors Houlihan Lokey, Inc. to explore financing and strategic alternatives given Lender's lack of liquidity. Lender is acting contrary to the Loan Agreement to deprive Borrower the benefits provided by the Loan Agreement as it relates to advances of money to Borrower.  Lender's efforts to not fund advances under the Loan as required by the governing documents are solely to preserve any limited available cash.

29.     On March 18, 2020, Lender, and its affiliated companies, released a company update showing that Lender had $143.2 million in cash on hand as of March 17, 2020 and $600 million of unfunded commitments. The unfunded portion of the Loan is among Lender's unfunded commitments revealing that Lender does not currently have enough cash on hand to fund all of its commitments to Borrower.

30.     On March 23, 2020, contrary to historic practices of paying dividends, Lender announced that it was delaying the payment of a dividend that it authorized just five (5) days prior, postponing the distribution from April 24, 2020 to July 14, 2020 due to "significant volatility and widening credit spreads" that have "resulted in the [Lender] being required to post cash collateral with its lenders."

31.     On April 2, 2020, Lender announced it had sold debt securities with a face value of approximately $572 million to paydown approximately $429 million of liabilities. Together with other sales of debt securities, the Lender recognized an aggregate loss on sale of approximately

$179 million. As part of this transaction, Lender had to use some of its available cash to pay down its liabilities putting it in a more compromised liquidity position.

32.     Lender, and affiliates, have engaged in reckless financial behavior that directly placed Lender in a position to not honor the obligations to Borrower as governed by the Loan Documents. Lender amassed a portfolio of over $950 million of speculative securities purchased irresponsibly with approximately $825 million (approximately 87% loan-to-value) of daily mark-to-market repurchasing agreement financing, exposing them to financially devasting margin calls. Ultimately and unsurprisingly, Lender's counterparties issued margin calls forcing Lender to sell its speculative securities for a loss. Lender's complete disregard for sound financial practices resulted in $179 million in losses directly causing Lender to not honor the contractual obligation to provide funding to Borrower.

33.     In the past two months, Lender's stock price has fallen from a high of $20.87 per share to a low of $2.52 per share, for an 88% decline.

34.     Lender and its agents have acted in bad faith to not fund advances under the Loan due to Lender's well-documented liquidity crisis.

**<u>Lender Refuses to Act in Good Faith to Fund Advances</u>**

35.     Section 2.1.2 of the Loan Agreement provides that Borrower can request, and Lender shall make, advances related to capital expenditures ("Cap-Ex"), tenant improvements and leasing commissions ("TI/LC"), related to Lender's Share of these expenses. The Loan Agreement defines "Lender's Share" as seventy-five percent (75%) of Cap-Ex Advances and eighty-five and seven-tenths percent (85.7%) of TI/LC Advances. The Loan Agreement does not give Lender absolute discretion to refuse to fund Advances.

36.     Both parties agreed under the Loan Agreement that time is of the essence for advances. Borrower is regularly incurring costs as it executes its business plan; vendors expect to be paid, tenants expect to have their respective spaces improved as negotiated in the leases, and brokers expect Borrower to reliably perform. Lender knows that it is detrimental to Borrower for the Kansas City market to learn that Lender is not funding Borrower's advances under the Loan specifically related to work at the Property. For example, leasing brokers are reluctant to bring new tenants to the Property if Lender is not funding advances for leasing commissions and contractors are reluctant to take on work at the Property if Lender is not funding advances for improvements.

37.     As of the Lender's December 4, 2019 approval of the Effective Budget, Borrower has regularly requested advances pursuant to that Effective Budget. Since December 2019, Borrower requested four (4) advances pursuant to the Effective Budget on the following dates: December 11, 2019, February 13, 2020, March 9, 2020, and April 9, 2020. To date, Lender has funded two (2) advances since Lender approved the Effective Budget in December 2019.

38.     In response to the February 2020 request, Lender claimed that it had no obligation to fund the advance request until it determined that the Loan was "in balance." Despite this claim, Lender never provided Borrower with notice of a shortfall nor did Lender provide Borrower with any specifics related to a potential Loan imbalance; instead, Lender funded the $2,073,100.85 advance in March.

39.     On March 9, 2020, Borrower requested an advance of $2,484,019.10 ("Advance 11") for capital expenditures, tenant improvements and leasing commissions, and other related costs ("Request 11"). Request 11 seeks only Lender's Share of the expenses under the Loan

Agreement; Borrower is ready, willing, and able to pay Borrower's Share of the expenses related to Request 11, as it has done for each of the ten (10) prior advances under the Loan.

40.     In the midst of Lender's above-described financial difficulties, Lender failed, and continues to fail, to fund Advance 11. Lender has acted in bad faith to not fund the Advance and to deprive Borrower the benefits of the Loan Agreement.

41.     On March 11, 2020, Lender sent Borrower an e-mail claiming that the Loan was out of balance based on *Borrower's Proposed New Loan*, which included items in a proposal that falls outside of the Effective Budget that Lender rejected months prior. Lender failed to provide Borrower with any specifics to support a shortfall or Loan imbalance.

42.     On March 12, 2020, the parties participated in a conference call wherein Borrower explained Advance 11 by outlining components of the Effective Budget and offered in good faith to fund certain expenses, as described below, not contained therein.

43.     From March 17, 2020 through March 24, 2020, Lender continued to stall Borrower's attempts to obtain information about Lender funding Advance 11. During this time, Lender stated that it was discussing the Effective Budget with its agents and Lender promised a timely response, lulling Borrower into believing that it would receive a timely, substantive response. On March 19, 2020, Lender stated that it would have a response the next day; receiving no further response, Borrower continued to request an update from Lender. On March 24, 2020, four (4) days later, Lender continued to delay Borrower the benefits of the Loan Agreement, stating that Lender was still reviewing and determining the amount of shortfall required to balance the Loan.

44.     Lender's bad faith stall tactics continued. On April 2, 2020, Lender represented that it was expecting to finalize its review the following week, at which point Lender would be able to respond in detail to the Request 11.

45.     On April 7, 2020, almost a month since receiving Request 11 for Advance 11, Lender still failed to fund Advance 11 or provide Borrower with information to enable Borrower to obtain Advance 11. Borrower provided Lender with a bank account statement evidencing proof that, as Borrower previously asserted as early as March 12, 2020, Borrower had the funds and it was ready to immediately fund any Rebalance Reserve Account[3], up to $1,016,932 in order for Lender to fund Advance 11. Attached hereto as **Exhibit C** is a true and correct copy of the April 7, 2020 letter from Borrower to Lender evidencing Borrower's ability to fund a reserve.

46.     On April 8, 2020, Borrower attempted to have an open dialogue with Peter Smith, Vice President of Sponsor and head of originations of Sponsor's manager, regarding the on-going issues with the Loan; however, Borrower attempts were ultimately ignored by Mr. Smith. On April 8, 2020, Borrower demanded, through the proper notice channels under the Loan Agreement, that Lender fund Advance 11 on or before April 14, 2020. Attached hereto as **Exhibit D** is a true and correct copy of the April 8, 2020 letter from Borrower to Lender demanding funding of Advance 11.

47.     On April 9, 2020, in response to Borrower's continued demand for Advance 11, Lender finally claimed that the Loan was not "in balance" and demanded $2,459,777 to be deposited in the Rebalance Reserve Account and an Interest Reserve Account. Attached hereto as **Exhibit E** is a true and correct copy of the April 9, 2020 response from Lender to Borrower.

---

[3] As defined in Section 7.3 of the Loan Agreement, a Lender-controlled account where Borrower is to deposit amounts pursuant to Section 2.14 of the Loan Agreement relating to "Insufficiency of Loan Proceeds".

48.     Under the Loan Agreement, the Lender funds any advances first through any amounts in the Rebalance Reserve Account. In a thinly veiled attempt to not fund under the Loan, Lender demands a grossly excessive amount from Borrower to be deposited in the Rebalance Reserve Account such that Lender avoids funding any advance with its own funds. The amount that Lender demands ($2.46M) is conveniently just under the amount Borrower requests in Advance 11 ($2.48M). Lender's calculation includes line items that are not in the Effective Budget and are not otherwise expenses required under any Leases.

49.     Section 2.14 provides that if Lender shall "reasonably" determine in its "good faith discretion" whether the Loan is "in balance" Lender shall provide Borrower notice thereof. Pursuant to this Section, the Loan is not "in balance" if there is a "Shortfall." Under the Loan Agreement a Shortfall exists if:

"(a) the cost of all Project Related Costs[4] necessary to achieve Final Completion[5] of the Project Improvements[6] that remain unpaid at the time in question exceeds the difference between

(A) the amount of Advances[7] then available to Borrower (including, without limitation, amounts in the Rebalancing Reserve Account) and

---

[4] "Project Related Costs" is defined as "all costs and expenses of constructing the Project Improvements (including, without limitation, Basic Carrying Costs and Debt Service)."

[5] "Final Completion" is defined as "Substantial Completion" of all "punch list items," all Approved Cap-Ex Expenses have been incurred, the permanent certificate of occupancy has been issued, and Borrower certifies it received all operating manuals and warranties with respect to building materials.

[6] "Project Improvements" is defined as "construction of the Property, as described in the Cap-Ex Scope of Work and as depicted in, and done in accordance with, the Cap-Ex Budget, the Plans and Specifications, all Legal Requirements and the terms and conditions of the Loan Documents."

[7] "Advances" is defined in Section 2.1.2 to include Cap-Ex Advance, TI/LC Advance, and Interest Advance.

(B) the amounts required to be paid for Basic Carrying Costs[8] and Debt Service,[9] or

(b) the cost of completing any line item in the Cap-Ex Budget exceeds the amount of Advances then available to Borrower allocated to such line item."

50.     Given the formula in Section 2.14, as of April 9, 2020, the following was true:

      (a)   Project Related Costs were $12,046,473.45;

(A) Advances available to Borrower were $11,029,541.45; and

(B) Basic Carrying Costs and Debt Service are covered by income from the Property, plus

      $436,556 that Borrower to be funded into a Lender-controlled reserve account.

Therefore, the (a) Project Related Costs exceeded the difference between (A) the available Advances and (B) the Carrying Costs and Debt Service (including amounts to be deposited into a reserve) by **$1,016,932.00**.

      (b) This is the same result comparing the line items in the Cap-Ex Budget to the available Advances.

51.     In addition, Lender requested that Borrower fund $436,556 into an Interest Reserve Account.

52.     Finally, Lender and Borrower agreed that $465,711 of line item expenses in the Effective Budget are not going to be used can be applied towards any Shortfall as a credit.

53.     Therefore, taking the amount calculated under Section 2.14 ($1,016,932.00) plus the Interest Reserve ($436,556) and less the credit ($465,711), if there is any Shortfall, it is a *maximum* of **$987,777**.

---

[8] "Basic Carrying Costs" is defined as "for any period, the sum of the following costs: (a) Taxes, (b) Other Charges and (c) Insurance Premiums."
[9] "Debt Service" is defined as "with respect to any period of time, scheduled principal and interest payments due under this Agreement and the Note."

54.     On April 9, 2020, Borrower addressed Lender's irrational demand of $2,459,777 and explained that, at most, any amount funded by Borrower for a Shortfall would be $987,7877. Attached hereto as **Exhibit F** is a true and correct copy of the April 9, 2020 letter from Borrower to Lender.

55.     On April 9, 2020, Borrower made a request for $1,473,600.37 ("Advance 12") to be funded for capital expenditures, tenant improvements and leasing commissions, and related work ("Request 12") as Lender's Share of the expenses. Borrower is ready, willing, and able to fund Borrower's Share. To date, Lender has failed to fund Advance 12.

56.     On April 13, 2020, Borrower asked Lender, through its agent Situs Asset Management ("Situs"), to confirm whether Lender would fund Advance 11.

57.     On April 14, 2020, Lender's Agent, Situs, stated that the amount required to bring the Loan "in balance" was the Lender's previously demanded $2,459,777.

58.     On April 15, 2020, Borrower explained that Lender's calculation was incorrect because the Effective Budget (approved by Lender months earlier in December 2019) does not include line items of $837,000 for "Clean Tower," $500,000 in costs related to work on the Southeast Ground Floor Lobby, or $135,000 related to work associated with the Elevator Cab Card Readers. Given the line items referenced in the Lender's April 9, 2020 letter, Borrower confirmed that it was ready to immediately fund $987,777 to the Interest Reserve Account and the Rebalance Reserve Account upon confirmation from the Lender that it would subsequently fund Advance 11. Attached hereto as **Exhibit G** is a true and correct copy of the April 15, 2020 letter between Borrower and Lender.

59.     Borrower requested that if Lender disagreed with Borrower's analysis, Lender provide Borrower with support for Lender's position, including reference to the applicable sections

in the Loan Agreement and evidence supporting approved Project Related Costs. To date, Lender has not provided Borrower with the requested support.

60.     To date, Lender has failed to fund Advance 11 or Advance 12.

### Borrower Continues to Suffer Damage

61.     In pursuit of its business plan related to the Property, Borrower has built and established relationships in the Kansas City market with local businesses, current tenants, prospective tenants, brokers, vendors, contractors, and other community leaders. Advance 11 and Advance 12 total $3,957,619.47, representing Lender's Share of expenses under the Loan. These Advances relate to actual and documented expenses in accordance with the Effective Budget. Various people, including small businesses, in the Kansas City market are relying on Borrower to complete certain work, including timely payment of certain outstanding invoices. Borrower engaged certain persons for work, and represented to relationships in the Kansas City market that it would complete certain work related to the Property in pursuit of Borrower's business plan based on Lender's representation to make timely advances under the Loan. Lender's bad faith actions in not making timely advances under the Loan harm Borrower's relationships in an amount that exceeds $75,000, to be proven at trial.

62.     Borrower has built a reputation in Kansas City since its first acquisition of property there in August 2016. Borrower developed relationships with the public and private sectors as a reputable counterparty who does what it says it is going to do. Those include relationships with the real estate community (landlords, brokers, tenants, developers, architects, contractors), the business community (local companies, community councils, the Economic Development Corporation of Kansas City, Port Authority of Kansas City, and the public sector).

63.     For example, when Borrower bought its first asset in 2016, it inherited a lawsuit against the City, and it worked closely with city officials to settle the lawsuit. Borrower took a 0% occupied, blighted office building and re-leased it to 100% occupancy with growing companies.

64.     Borrower has invested in the community of Kansas City. Borrower contributes to the Kansas City Area Development Council which serves to bring economic investment to the Kansas City area. Borrower sponsored the 2020 Downtown Council Annual luncheon.

65.     Lender's failure to fund the Advances damages Borrower's reputation in Kansas City among its relationships as alleged.

### First Claim for Breach of Contract
### (Against All Defendants)

66.     Borrower repeats and realleges each of the allegations set forth above, as if fully set forth herein.

67.     The Loan Agreement between Borrower and Lender has an implied covenant of good faith and fair dealing whereby Lender agreed, that in the course of performing under the Loan Agreement, Lender, its agents, successors, and assigns, would not do anything which had the effect of destroying or injuring the right of Borrower to receive the fruits of the Loan Agreement.

68.     A reasonable lender would understand that Borrower requires timely funding of advances and requires Lender to act in good faith in its determination of any shortfall under the Loan, in order for Borrower to complete its business plan.

69.     Borrower is not in default under the Loan Agreement. To date, Borrower has performed all obligations under the Loan Agreement, or has been prevented from performing or excused from performance due to Lender's acts or omissions.

70.     As described herein, Lender has breached the Loan Agreement's implied covenant of good faith and fair dealing. Lender is not acting in good faith. Lender is acting for its own

personal gain in refusing to fund the Advance. Lender arbitrarily and irrationally demands $2,459,777 to bring the Loan in balance before it will fund Advance 11. Borrower has received no further response from Lender regarding Advance 12, after Lender agreed to the advance. Lender's acts deprive Borrower of the fruits of the Loan Agreement.

71.     Lender's arbitrary demand of $2,459,777 is irrationally based on expenses that are not included within the Effective Budget, that are not related to any Leases, and that Borrower has expressly informed Lender Borrower intends not to complete. Borrower has clearly communicated this to Lender and Borrower has represented that, based on Lender's demand, Borrower is ready, willing, and able to fund $987,777 to the Interest Reserve Account and the Rebalance Reserve Account, for any alleged shortfall, upon confirmation from the Lender that it would subsequently fund Advance 11.

72.     Lender's demand is in gross excess of the amounts allowed under the Loan Agreement, and those amounts related to the Effective Budget and TI/LC work.

73.     Borrower provided Lender with evidence that it was ready to immediately fund any shortfall based on the Effective Budget, tenant improvements and leasing commissions, or other work that may be considered by the Lender in its good faith determination of a shortfall under Section 2.14 of the Loan Agreement. Borrower is also ready, willing, and able to fund Borrower's Share of all expenses.

74.     Borrower has not waived its right to recover damages as a result of Lender's failure to act in good faith under the Loan Agreement for its implied covenants.

75.     As a result of Lender's conduct described herein, Borrower has suffered and continues to suffer substantial loss and other damage. Lender has irreparably injured Borrower's business, reputation, goodwill, and will continue to do so.

### Second Claim for Declaratory Relief
### (Against All Defendants)

76.      Borrower repeats and realleges each of the allegations set forth above, as if fully set forth herein.

77.      Lender arbitrarily and irrationally demanded that Borrower pay $2,459,777 to bring the Loan "in balance" before Lender will fund Advance 11. Lender has not responded to Advance 12 after agreeing to fund it.

78.      As alleged herein, Lender's demand is in gross excess of the amounts allowed under the Loan Agreement, and those amounts related to the Effective Budget and TI/LC work. Borrower has provided Lender with evidence that Borrower is ready, willing, and able to immediately fund $987,777 to the Interest Reserve Account and the Rebalance Reserve Account upon confirmation from the Lender that it would subsequently fund Advance 11.

79.      Advance 11 and Advance 12 total $3,957,619.47 in Lender's Share of expenses under the Loan that Lender refuses to fund. Instead, Lender requires Borrower to fund Lender's Share through an arbitrary claim of a grossly excessive "Shortfall" that Lender has irrationally calculated in bad faith given Lender's inability to fund its obligations under the Loan or Lender's desire to preserve its own liquidity.

80.      An actual and justiciable controversy exists between Borrower, on the one hand, and Defendants, on the other hand, such that Borrower requests this Court to declare each of the following:

a.      The amount to be paid by Borrower for any Shortfall under Section 2.14 of the Loan Agreement, including the Interest Reserve amounts, and any credits, is at most $987,777; and

b.      Lender must fund the amounts for Advance 11 and Advance 12

immediately upon Borrower's payment of $987,777 into the Interest

Reserve Account and Rebalance Reserve Account.

81. A declaration by this Court is necessary and vital to determine and validate the rights and interests of Borrower and to compel its enforcement under the Loan Agreement.

82.    Borrower has no adequate remedy at law.

### Third Claim for Injunctive Relief
### (Against All Defendants)

83.     Borrower repeats and realleges each of the allegations set forth above, as if fully set forth herein.

84.    As alleged herein, there is a substantial probability that Borrower will prevail in its claims against Lender. Lender is not liquid and Lender is not performing its obligations to fund under the Loan. Despite the clear language of the Loan Agreement, and Borrower's clear communications regarding capital expenditures, tenant improvements, and leasing commissions as they relate to the Effective Budget, Lender has grossly exaggerated a Shortfall. Lender has acted in bad faith to refuse to fund Advances under the Loan that total no less than $3,957,619.47 and Borrower has suffered damage.

85.    Lender has claimed that there is a grossly excessive Shortfall under the Loan Agreement. Pursuant to the Loan Agreement, Borrower has ten (10) business days to fund the Shortfall or it is an event of default under the Loan Agreement. During the pendency of this action, because of the instant dispute, Lender will claim that Borrower is in default under the Loan. There is a significant, immediate threat that Lender will attempt to foreclose on the Property as a result of the instant dispute, which will result in irreparable injury or loss to Borrower in the absence of relief, which includes, but is not limited to, loss of the Property, loss of business, and further

damage to Borrower's reputation and goodwill in the Kansas City market. Such harm can be difficult to measure and is not adequately compensable by money damages.

86.     As alleged herein, Borrower is prepared to immediately fund the $987,777 Shortfall, including the Interest Reserve Account, as calculated above based on the Effective Budget. If Lender accelerates the Loan and initiates a non-judicial foreclosure on the Property in order to own the Property, Lender will obtain a windfall. Lender will suffer no harm caused by the proposed injunction.

87.     An injunction of Lender serves a public interest of not permitting financial institutions from acting in bad faith to deprive borrowers the fruits of a loan agreement and then, based on those bad faith acts, to trigger a default under the loan agreement and foreclose on the security for the Loan.

88.     Borrower has no adequate remedy at law.

**Prayer for Relief**

**WHEREFORE**, Plaintiff Somera Road – 1100 Main Street, LLC ("Borrower") prays for

judgment against Defendants as follows:

1.  For damages according to proof as a result of Lender's acts complained of herein;

2.  For a Court order directing Lender to fund the Advances as complained of herein;

3.  For temporary, preliminary, and permanent injunctive relief enjoining Lender from taking

    any adverse action against the Property during the pendency of this action;

4.  For attorneys' fees and costs as a result of Lender's act complained of herein;

5.  For other and further relief as the Court deems just and proper in law and in equity.

Dated: New York, New York
　　　　April 21, 2020

> PARNESS LAW FIRM, PLLC
>
> By: _____/s/ Hillel I. Parness_____
> Hillel I. Parness (HP-1638)
> 136 Madison Ave., 6th Floor
> New York, New York  10016
> Tel: (212) 447-5299
> Fax: (212) 202-6002
> hip@hiplaw.com
> *Attorneys for Plaintiff Somera Road – 1100*
> *Main Street, LLC*